(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ALLEYNE *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 11–9335.   Argued January 14, 2013—Decided June 17, 2013

Petitioner Alleyne was charged, as relevant here, with using or carrying a firearm in relation to a crime of violence, 18 U. S. C. §924(c)(1)(A), which carries a 5-year mandatory minimum sentence, §924(c)(1)(A)(i), that increases to a 7-year minimum "if the firearm is brandished," §924(c)(1)(A)(ii), and to a 10-year minimum "if the firearm is discharged," §924(c)(1)(A)(iii).  In convicting Alleyne, the jury form indicated that he had "[u]sed or carried a firearm during and in relation to a crime of violence," but not that the firearm was "[b]randished."  When the presentence report recommended a 7-year sentence on the §924(c) count, Alleyne objected, arguing that the verdict form clearly indicated that the jury did not find brandishing beyond a reasonable doubt and that raising his mandatory minimum sentence based on a sentencing judge's finding of brandishing would violate his Sixth Amendment right to a jury trial.  The District Court overruled his objection, relying on this Court's holding in *Harris* v. *United States*, 536 U. S. 545, that judicial factfinding that increases the mandatory minimum sentence for a crime is permissible under the Sixth Amendment.  The Fourth Circuit affirmed, agreeing that Alleyne's objection was foreclosed by *Harris.*

*Held*: The judgment is vacated, and the case is remanded.  Pp. 10–17.

457 Fed. Appx. 348, vacated and remanded.

JUSTICE THOMAS delivered the opinion of the Court with respect to Parts I, III–B, III–C, and IV, concluding:

1. Because mandatory minimum sentences increase the penalty for a crime, any fact that increases the mandatory minimum is an "element" that must be submitted to the jury.  Accordingly, *Harris* is overruled.  Pp. 10–16.

(a) *Apprendi* v. *New Jersey*, 530 U. S. 466, concluded that any "'facts that increase the prescribed range of penalties to which a criminal defendant is exposed'" are elements of the crime, *id.*, at 490, and thus the Sixth Amendment provides defendants with the right to have a jury find those facts beyond a reasonable doubt, *id.*, at 484. *Apprendi*'s principle applies with equal force to facts increasing the mandatory minimum, for a fact triggering a mandatory minimum alters the prescribed range of sentences to which a criminal defendant is exposed. *Id.,* at 490. Because the legally prescribed range *is* the penalty affixed to the crime, it follows that a fact increasing either end of the range produces a new penalty and constitutes an ingredient of the offense. It is impossible to dissociate the floor of a sentencing range from the penalty affixed to the crime. The fact that criminal statutes have long specified both the floor and ceiling of sentence ranges is evidence that both define the legally prescribed penalty. It is also impossible to dispute that the facts increasing the legally prescribed floor aggravate the punishment, heightening the loss of liberty associated with the crime. Defining facts that increase a mandatory minimum to be part of the substantive offense enables the defendant to predict the legally applicable penalty from the face of the indictment, see *id.,* at 478–479, and preserves the jury's historic role as an intermediary between the State and criminal defendants, see *United States* v. *Gaudin*, 515 U. S. 506, 510–511. In reaching a contrary conclusion, *Harris* relied on the fact that the 7-year minimum sentence could have been imposed with or without a judicial finding of brandishing, because the jury's finding authorized a sentence of five years to life, 536 U. S., at 561, but that fact is beside the point. The essential Sixth Amendment inquiry is whether a fact is an element of the crime. Because the fact of brandishing aggravates the legally prescribed range of allowable sentences, it constitutes an element of a separate, aggravated offense that must be found by the jury, regardless of what sentence the defendant might have received had a different range been applicable. There is no basis in principle or logic to distinguish facts that raise the maximum from those that increase the minimum. Pp. 10–15.

(b) This ruling does not mean that any fact that influences judicial discretion must be found by a jury. This Court has long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment. See, *e.g., Dillon* v. *United States*, 560 U. S. ___, ___. Pp. 15–16.

2. Here, the sentencing range supported by the jury's verdict was five years' imprisonment to life, but the judge, rather than the jury, found brandishing. This increased the penalty to which Alleyne was subjected and violated his Sixth Amendment rights. Pp. 16–17.

Syllabus

JUSTICE THOMAS, joined by JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN, concluded in Parts II and III–A:

1. The Sixth Amendment right to trial "by an impartial jury," in conjunction with the Due Process Clause, requires that each element of a crime be proved to the jury beyond a reasonable doubt. *Gaudin*, 515 U. S., at 510. Several divided opinions of this Court have addressed the constitutional status of a "sentencing factor." In *McMillan* v. *Pennsylvania*, 477 U. S. 79, 86, the Court held that facts found to increase a mandatory minimum sentence are sentencing factors that a judge could find by a preponderance of the evidence. In *Apprendi*, however, the Court declined to extend *McMillan* to a New Jersey statute that increased the maximum term of imprisonment if the trial judge found that the crime was committed with racial bias, 530 U. S., at 470, finding that any fact that increased the prescribed statutory maximum sentence must be an "element" of the offense to be found by the jury. *Id.,* at 483, n. 10, 490. Two years later in *Harris,* the Court declined to apply *Apprendi* to facts that increased the mandatory minimum sentence but not the maximum sentence. 536 U. S., at 557. Pp. 3–6.

2. The touchstone for determining whether a fact must be found by a jury beyond a reasonable doubt is whether the fact constitutes an "element" of the charged offense. *United States* v. *O'Brien*, 560 U. S. 218, ___. *Apprendi*'s definition necessarily includes not only facts that increase the ceiling, but also those that increase the floor. At common law, the relationship between crime and punishment was clear. A sentence was prescribed for each offense, leaving judges with little sentencing discretion. If a fact was by law essential to the penalty, it was an element of the offense. There was a well-established practice of including in the indictment, and submitting to the jury, every fact that was a basis for imposing or increasing punishment. And this understanding was reflected in contemporaneous court decisions and treatises. Pp. 6–10.

JUSTICE BREYER, agreeing that *Harris* v. *United States*, 536 U. S. 545, should be overruled, concluded that he continues to disagree with *Apprendi* v. *New Jersey*, 530 U. S. 466, because it fails to recognize the law's traditional distinction between elements of a crime and sentencing facts, but finds it highly anomalous to read *Apprendi* as insisting that juries find sentencing facts that *permit* a judge to impose a higher sentence while not insisting that juries find sentencing facts that *require* a judge to impose a higher sentence. Overruling *Harris* and applying *Apprendi*'s basic jury-determination rule to mandatory minimum sentences would erase that anomaly. Where a *maximum* sentence is at issue, *Apprendi* means that a judge who *wishes* to impose a higher sentence cannot do so unless a jury finds

the requisite statutory factual predicate.  Where a *mandatory mini-mum* sentence is at issue, *Apprendi* would mean that the government cannot force a judge who *does not wish* to impose a higher sentence to do so unless a jury finds the requisite statutory factual predicate. Pp. 1–3.

THOMAS, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, III–B, III–C, and IV, in which GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined, and an opinion with respect to Parts II and III–A, in which GINSBURG, SO-TOMAYOR, and KAGAN, JJ., joined.  SOTOMAYOR, J., filed a concurring opinion, in which GINSBURG and KAGAN, JJ., joined.  BREYER, J., filed an opinion concurring in part and concurring in the judgment.  ROBERTS, C. J., filed a dissenting opinion, in which SCALIA and KENNEDY, JJ., joined.  ALITO, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–9335

_____

## ALLEN RYAN ALLEYNE, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 17, 2013]

JUSTICE THOMAS announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, III–B, III–C, and IV, and an opinion with respect to Parts II and III–A, in which JUSTICE GINSBURG, JUSTICE SOTOMAYOR, AND JUSTICE KAGAN join.

In *Harris* v. *United States*, 536 U. S. 545 (2002), this Court held that judicial factfinding that increases the mandatory minimum sentence for a crime is permissible under the Sixth Amendment. We granted certiorari to consider whether that decision should be overruled. 568 U. S. ___ (2012).

*Harris* drew a distinction between facts that increase the statutory maximum and facts that increase only the mandatory minimum. We conclude that this distinction is inconsistent with our decision in *Apprendi* v. *New Jersey*, 530 U. S. 466 (2000), and with the original meaning of the Sixth Amendment. Any fact that, by law, increases the penalty for a crime is an "element" that must be submitted to the jury and found beyond a reasonable doubt. See *id.,* at 483, n. 10, 490. Mandatory minimum sentences increase the penalty for a crime. It follows, then, that any

fact that increases the mandatory minimum is an "element" that must be submitted to the jury. Accordingly, *Harris* is overruled.

I

Petitioner Allen Ryan Alleyne and an accomplice devised a plan to rob a store manager as he drove the store's daily deposits to a local bank. By feigning car trouble, they tricked the manager to stop. Alleyne's accomplice approached the manager with a gun and demanded the store's deposits, which the manager surrendered. Alleyne was later charged with multiple federal offenses, including robbery affecting interstate commerce, 18 U. S. C. §1951(a), and using or carrying a firearm in relation to a crime of violence, §924(c)(1)(A). Section 924(c)(1)(A) provides, in relevant part, that anyone who "uses or carries a firearm" in relation to a "crime of violence" shall:

> "(i) be sentenced to a term of imprisonment of not less than 5 years;
> "(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
> "(iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years."

The jury convicted Alleyne. The jury indicated on the verdict form that Alleyne had "[u]sed or carried a firearm during and in relation to a crime of violence," but did not indicate a finding that the firearm was "[b]randished." App. 40.

The presentence report recommended a 7-year sentence on the §924(c) count, which reflected the mandatory minimum sentence for cases in which a firearm has been "brandished," §924(c)(1)(A)(ii). Alleyne objected to this recommendation. He argued that it was clear from the verdict form that the jury did not find brandishing beyond a reasonable doubt and that he was subject only to the

5-year minimum for "us[ing] or carr[ying] a firearm." Alleyne contended that raising his mandatory minimum sentence based on a sentencing judge's finding that he brandished a firearm would violate his Sixth Amendment right to a jury trial.

The District Court overruled Alleyne's objection. It explained that, under *Harris*, brandishing was a sentencing factor that the court could find by a preponderance of evidence without running afoul of the Constitution. It found that the evidence supported a finding of brandishing, and sentenced Alleyne to seven years' imprisonment on the §924(c) count. The Court of Appeals affirmed, likewise noting that Alleyne's objection was foreclosed by *Harris*. 457 Fed. Appx. 348 (CA4 2011) (*per curiam*).

## II

The Sixth Amendment provides that those "accused" of a "crime" have the right to a trial "by an impartial jury." This right, in conjunction with the Due Process Clause, requires that each element of a crime be proved to the jury beyond a reasonable doubt. *United States* v. *Gaudin*, 515 U. S. 506, 510 (1995); *In re Winship*, 397 U. S. 358, 364 (1970). The substance and scope of this right depend upon the proper designation of the facts that are elements of the crime.

## A

The question of how to define a "crime"—and, thus, how to determine what facts must be submitted to the jury—has generated a number of divided opinions from this Court. The principal source of disagreement is the constitutional status of a special sort of fact known as a "sentencing factor." This term was first used in *McMillan* v. *Pennsylvania*, 477 U. S. 79, 86 (1986), to refer to facts that are not found by a jury but that can still increase the defendant's punishment. Following *McMillan*'s introduc-

tion of this term, this Court has made a number of efforts
to delimit its boundaries.

*McMillan* initially invoked the distinction between
"elements" and "sentencing factors" to reject a constitu-
tional challenge to Pennsylvania's Mandatory Minimum
Sentencing Act, 42 Pa. Cons. Stat. §9712 (1982).  That law
provided that anyone convicted of certain felonies would
be subject to a mandatory minimum sentence if the judge
found, by a preponderance of evidence, that the person
"'visibly possessed a firearm'" in the course of committing
specified crimes.  477 U. S., at 81, n. 1.  While the Court
acknowledged that there were constitutional limits to the
State's ability to "defin[e] crimes and prescrib[e] penal-
ties," it found that the Commonwealth had permissi-
bly defined visible possession as a sentencing factor,
rather than an element.  *Id.*, at 86.  In the Court's view,
this allowed the judge, rather than the jury, to find this
fact by a preponderance of evidence without violating the
Constitution.

*McMillan* did not address whether legislatures' freedom
to define facts as sentencing factors extended to findings
that increased the *maximum* term of imprisonment for an
offense.  We foreshadowed an answer to this question in
*Jones* v. *United States*, 526 U. S. 227, 243, n. 6 (1999), but
did not resolve the issue until *Apprendi*.  There, we identi-
fied a concrete limit on the types of facts that legislatures
may designate as sentencing factors.

In *Apprendi*, the defendant was sentenced to 12 years'
imprisonment under a New Jersey statute that increased
the maximum term of imprisonment from 10 years to 20
years if the trial judge found that the defendant commit-
ted his crime with racial bias.  530 U. S., at 470.  In de-
fending its sentencing scheme, the State of New Jersey
argued that, under *McMillan*, the legislature could define
racial bias as a sentencing factor to be found by the judge.
We declined to extend *McMillan* that far.  We explained

that there was no "principled basis for treating" a fact increasing the maximum term of imprisonment differently than the facts constituting the base offense. 530 U. S., at 476. The historic link between crime and punishment, instead, led us to conclude that any fact that increased the prescribed statutory maximum sentence must be an "element" of the offense to be found by the jury. *Id.,* at 483, n. 10, 490. We, thus, found that Apprendi's sentence had been unconstitutionally enhanced by the judge's finding of racial bias by a preponderance of evidence. *Id.,* at 491–492.

### B

While *Apprendi* only concerned a judicial finding that increased the statutory maximum, the logic of *Apprendi* prompted questions about the continuing vitality, if not validity, of *McMillan*'s holding that facts found to increase the mandatory minimum sentence are sentencing factors and not elements of the crime. We responded two years later in *Harris* v. *United States*, 536 U. S. 545, where we considered the same statutory provision and the same question before us today.

In *Harris*, the defendant was charged, under §924(c)(1)(A), with carrying a firearm in the course of committing a drug trafficking crime. The mandatory minimum sentence based on the jury's verdict alone was five years, but the District Court imposed a 7-year mandatory minimum sentence based on its finding, by a preponderance of evidence, that the defendant also brandished the firearm. As in this case, Harris challenged his sentence on the ground that the 7-year mandatory minimum sentence was unconstitutional under *Apprendi*, even though the judge's finding did not alter the maximum sentence to which he was exposed. *Harris, supra,* at 551.

The Court declined to apply *Apprendi* to facts that increased the mandatory minimum sentence but not the

maximum sentence. 536 U. S., at 557. In the Court's view, judicial factfinding that increased the mandatory minimum did not implicate the Sixth Amendment. Because the jury's verdict "authorized the judge to impose the minimum with or without the finding," *ibid.,* the Court was of the view that the factual basis for increasing the minimum sentence was not "'essential'" to the defendant's punishment. *Id.,* at 560–561 (plurality opinion). Instead, it merely limited the judge's "choices within the authorized range." *Id.,* at 567. From this, the Court drew a distinction between "facts increasing the defendant's minimum sentence and facts extending the sentence beyond the statutory maximum," *id.,* at 566. The Court limited *Apprendi*'s holding to instances where the factual finding increases the statutory maximum sentence.

### III

Alleyne contends that *Harris* was wrongly decided and that it cannot be reconciled with our reasoning in *Apprendi.* We agree.

### A

The touchstone for determining whether a fact must be found by a jury beyond a reasonable doubt is whether the fact constitutes an "element" or "ingredient" of the charged offense. *United States* v. *O'Brien,* 560 U. S. 218, ___ (2010) (slip op., at 5); *Apprendi, supra,* at 483, n. 10; J. Archbold, Pleading and Evidence in Criminal Cases 52 (5th Am. ed. 1846) (hereinafter Archbold). In *Apprendi,* we held that a fact is by definition an element of the offense and must be submitted to the jury if it increases the punishment above what is otherwise legally prescribed. 530 U. S., at 483, n. 10. While *Harris* declined to extend this principle to facts increasing mandatory minimum sentences, *Apprendi*'s definition of "elements" necessarily includes not only facts that increase the ceiling, but also those that increase

the floor. Both kinds of facts alter the prescribed range of sentences to which a defendant is exposed and do so in a manner that aggravates the punishment. 530 U. S., at 483, n. 10; *Harris, supra,* at 579 (THOMAS, J., dissenting). Facts that increase the mandatory minimum sentence are therefore elements and must be submitted to the jury and found beyond a reasonable doubt.

1

At common law, the relationship between crime and punishment was clear. As discussed in *Apprendi,* "[t]he substantive criminal law tended to be sanction-specific," meaning "it prescribed a particular sentence for each offense." Langbein, The English Criminal Trial Jury on the Eve of the French Revolution, in The Trial Jury in England, France, Germany 1700–1900, p. 36 (A. Schioppa ed. 1987) (quoted in *Apprendi, supra,* at 479). The system left judges with little sentencing discretion: once the facts of the offense were determined by the jury, the "judge was meant simply to impose [the prescribed] sentence." Langbein, *supra,* at 36–37; see also 3 W. Blackstone, Commentaries on the Laws of England 396 (1768) ("THE judgment, though pronounced or awarded by the judges, is not their determination or sentence, but the determination and sentence of the law" (emphasis deleted)). This Court has recognized that the same was true, in many instances, early on in this country. *United States* v. *Grayson,* 438 U. S. 41, 45 (1978); see, *e.g., Commonwealth* v. *Smith,* 1 Mass. 245 (1804) (describing state law that specified a punishment for larceny of damages *three times* the value of the stolen goods). While some early American statutes provided *ranges* of permissible sentences, K. Stith & J. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 9 (1998), the ranges themselves were linked to particular facts constituting the elements of the crime. *E.g., Lacy* v. *State,* 15 Wis. 13 (1862) (discussing

arson statute that provided for a sentence of 7 to 14 years where the house was occupied at the time of the offense, but a sentence of 3 to 10 if it was not); Ga. Penal Code §§4324–4325 (1867) (robbery "by open force or violence" was punishable by 4 to 20 years' imprisonment, while "[r]obbery by intimidation, or without using force and violence," was punishable by 2 to 5 years' imprisonment). This linkage of facts with particular sentence ranges (defined by both the minimum and the maximum) reflects the intimate connection between crime and punishment.

Consistent with this connection between crime and punishment, various treatises defined "crime" as consisting of every fact which "is in law essential to the punishment sought to be inflicted," 1 J. Bishop, Criminal Procedure 50 (2d ed. 1872) (hereinafter Bishop), or the whole of the wrong "to which the law affixes . . . punishment," *id.*, §80, at 51.  See also 1 J. Bishop, New Criminal Procedure §84, p. 49 (4th ed. 1895) (defining crime as "that wrongful aggregation [of elements] out of which the punishment proceeds"); Archbold 128 (defining crime to include any fact that "annexes a higher degree of punishment").  Numerous high courts agreed that this formulation "accurately captured the common-law understanding of what facts are elements of a crime." *Apprendi*, 530 U. S., at 511–512 (THOMAS, J., concurring) (collecting cases).  If a fact was by law essential to the penalty, it was an element of the offense.

2

From these widely recognized principles followed a well-established practice of including in the indictment, and submitting to the jury, every fact that was a basis for imposing or increasing punishment.  While an exhaustive history need not be recounted here, see *id.*, at 501–509 (THOMAS, J., concurring) (detailing practices of American courts from the 1840's onward), a few particularly salient

examples illustrate the point.  In *Hope* v. *Commonwealth*, 50 Mass. 134 (1845), the defendant was indicted for (and convicted of) larceny.  The larceny statute established two levels of sentencing based on whether the value of the stolen property exceeded $100.  Because punishment varied with value, the state high court found that value was an element of the offense:

> "Our statutes, it will be remembered, prescribe the punishment for larceny, with reference to the value of the property stolen; and for this reason, as well as because it is in conformity with long established practice, the court are of [the] opinion that the value of the property alleged to be stolen must be set forth in the indictment." *Id.*, at 137.

Numerous other contemporaneous court decisions reflect this same understanding.  See, *e.g.*, *Ritchey* v. *State*, 7 Blackf. 168, 169 (Ind. 1844) (holding that indictment for arson must allege value of property destroyed, because statute set punishment based on value); *United States* v. *Fisher*, 25 F. Cas. 1086 (No. 15,102) (CC Ohio 1849) (McLean, J.) ("A carrier of the mail is subject to a higher penalty where he steals a letter out of the mail, which contains an article of value.  And when this offense is committed, the indictment must allege the letter contained an article of value, which aggravates the offense and incurs a higher penalty").

A number of contemporaneous treatises similarly took the view that a fact that increased punishment must be charged in the indictment.  As one 19th-century commentator explained:

> "Where a statute annexes a higher degree of punishment to a common-law felony, if committed under particular circumstances, an indictment for the offence, in order to bring the defendant within that higher degree of punishment, must expressly charge it to have

been committed under those circumstances, and must
state the circumstances with certainty and precision.
[2 M. Hale, Pleas of the Crown \*170].”  Archbold 51
(15th ed. 1862).

Another explained that “the indictment must contain an
allegation of every fact which is legally essential to the
punishment to be inflicted.”  Bishop §81, at 51.  This rule
“enabled [the defendant] to determine the species of of-
fence” with which he was charged “in order that he may
prepare his defence accordingly . . . and *that there may be
no doubt as to the judgment which should be given*, if the
defendant be convicted.”  Archbold 44 (emphasis added).
As the Court noted in *Apprendi*, “[t]he defendant’s ability
to predict with certainty the judgment from the face of the
felony indictment flowed from the invariable linkage of
punishment with crime.”  530 U. S., at 478.

## B

Consistent with common-law and early American prac-
tice, *Apprendi* concluded that any “facts that increase the
prescribed range of penalties to which a criminal defend-
ant is exposed” are elements of the crime.  *Id.*, at 490
(internal quotation marks omitted); *id.*, at 483, n. 10
(“[F]acts that expose a defendant to a punishment greater
than that otherwise legally prescribed were by definition
‘elements’ of a separate legal offense”).[1]  We held that the
Sixth Amendment provides defendants with the right to
have a jury find those facts beyond a reasonable doubt.
*Id.*, at 484.  While *Harris* limited *Apprendi* to facts in-
creasing the statutory maximum, the principle applied in
*Apprendi* applies with equal force to facts increasing the

---

[1] In *Almendarez-Torres* v. *United States*, 523 U. S. 224 (1998), we
recognized a narrow exception to this general rule for the fact of a prior
conviction.  Because the parties do not contest that decision’s vitality,
we do not revisit it for purposes of our decision today.

mandatory minimum.

It is indisputable that a fact triggering a mandatory minimum alters the prescribed range of sentences to which a criminal defendant is exposed. *Apprendi, supra*, at 490; *Harris*, 536 U. S., at 575, 582 (THOMAS, J., dissenting). But for a finding of brandishing, the penalty is five years to life in prison; with a finding of brandishing, the penalty becomes seven years to life. Just as the maximum of life marks the outer boundary of the range, so seven years marks its floor. And because the legally prescribed range *is* the penalty affixed to the crime, *infra*, this page, it follows that a fact increasing either end of the range produces a new penalty and constitutes an ingredient of the offense. *Apprendi, supra*, at 501 (THOMAS, J., concurring); see also Bishop §598, at 360–361 (if "a statute prescribes a *particular punishment* to be inflicted on those who commit it under special circumstances which it mentions, or with particular aggravations," then those special circumstances must be specified in the indictment (emphasis added)); 1 F. Wharton, Criminal Law §371, p. 291 (rev. 7th ed. 1874) (similar).

It is impossible to dissociate the floor of a sentencing range from the penalty affixed to the crime. See *Harris*, *supra*, at 569 (BREYER, J., concurring in part and concurring in judgment) (facts increasing the minimum and facts increasing the maximum cannot be distinguished "in terms of logic"). Indeed, criminal statutes have long specified both the floor and ceiling of sentence ranges, which is evidence that both define the legally prescribed penalty. See, *e.g., supra,* at 7–8; N. Y. Penal Code §§231–232, p. 70 (1882) (punishment for first-degree robbery was 10 to 20 years' imprisonment; second-degree robbery was 5 to 15 years); Va. Code ch. 192, §§1–2, p. 787 (2d ed. 1860) (arson committed at night was punishable by 5 to 10 years; arson committed during the day was 3 to 10 years). This historical practice allowed those who violated the law to know, *ex*

*ante*, the contours of the penalty that the legislature af-
fixed to the crime—and comports with the obvious truth
that the floor of a mandatory range is as relevant to
wrongdoers as the ceiling. A fact that increases a sen-
tencing floor, thus, forms an essential ingredient of the
offense.

Moreover, it is impossible to dispute that facts increas-
ing the legally prescribed floor *aggravate* the punishment.
*Harris, supra*, at 579 (THOMAS, J., dissenting); *O'Brien*,
560 U. S., at ___ (THOMAS, J., concurring in judgment)
(slip op., at 2). Elevating the low-end of a sentenc-
ing range heightens the loss of liberty associated with
the crime: the defendant's "expected punishment has
increased as a result of the narrowed range" and "the prose-
cution is empowered, by invoking the mandatory mini-
mum, to require the judge to impose a higher punishment
than he might wish." *Apprendi, supra*, at 522 (THOMAS,
J., concurring). Why else would Congress link an in-
creased mandatory minimum to a particular aggravating
fact other than to heighten the consequences for that
behavior? See *McMillan*, 477 U. S., at 88, 89 (twice noting
that a mandatory minimum "'ups the ante'" for a criminal
defendant); *Harris, supra*, at 580 (THOMAS, J., dissenting).
This reality demonstrates that the core crime and the fact
triggering the mandatory minimum sentence together
constitute a new, aggravated crime, each element of which
must be submitted to the jury.[2]

———————

[2] Juries must find any facts that increase either the statutory maxi-
mum or minimum because the Sixth Amendment applies where a
finding of fact both alters the legally prescribed range *and* does so in a
way that aggravates the penalty. Importantly, this is distinct from
factfinding used to guide judicial discretion in selecting a punishment
"within limits fixed by law." *Williams* v. *New York*, 337 U. S. 241, 246
(1949). While such findings of fact may lead judges to select sentences
that are more severe than the ones they would have selected without
those facts, the Sixth Amendment does not govern that element of
sentencing. *Infra,* at 15–17, and n. 6.

Defining facts that increase a mandatory statutory minimum to be part of the substantive offense enables the defendant to predict the legally applicable penalty from the face of the indictment. See *Apprendi*, 530 U. S., at 478–479. It also preserves the historic role of the jury as an intermediary between the State and criminal defendants. See *United States* v. *Gaudin*, 515 U. S., at 510–511 ("This right was designed 'to guard against a spirit of oppression and tyranny on the part of rulers,' and 'was from very early times insisted on by our ancestors in the parent country, as the great bulwark of their civil and political liberties'" (quoting 2 J. Story, Commentaries on the Constitution of the United States §§1779, 1780, pp. 540–541 (4th ed. 1873))); *Williams* v. *Florida*, 399 U. S. 78, 100 (1970) ("[T]he essential feature of a jury obviously lies in [its] interposition between the accused and his accuser"); *Duncan* v. *Louisiana*, 391 U. S. 145, 155 (1968) ("A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government").

In adopting a contrary conclusion, *Harris* relied on the fact that the 7-year minimum sentence could have been imposed with or without a judicial finding of brandishing, because the jury's finding already authorized a sentence of five years to life. 536 U. S., at 561. The dissent repeats this argument today. See *post*, at 5 (opinion of ROBERTS, C. J.) ("The jury's verdict authorized the judge to impose the precise sentence he imposed for the precise factual reason he imposed it"). While undoubtedly true, this fact is beside the point.[3]

—————

[3] *Apprendi* rejected an argument similar to the one advanced in *Harris*. In *Apprendi*, the State of New Jersey argued that increasing the defendant's statutory maximum on the challenged count did not violate the Sixth Amendment because "the judge could have imposed consecutive sentences," in conjunction with other counts, to produce the sentence that the defendant actually received on the count at issue. 530 U. S., at 474. We found that this possibility did not preclude a Sixth

As noted, the essential Sixth Amendment inquiry is whether a fact is an element of the crime. When a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury. It is no answer to say that the defendant could have received the same sentence with or without that fact. It is obvious, for example, that a defendant could not be convicted and sentenced for assault, if the jury only finds the facts for larceny, even if the punishments prescribed for each crime are identical. One reason is that each crime has different elements and a defendant can be convicted only if the jury has found each element of the crime of conviction.

Similarly, because the fact of brandishing aggravates the legally prescribed range of allowable sentences, it constitutes an element of a separate, aggravated offense that must be found by the jury, regardless of what sentence the defendant *might* have received if a different range had been applicable. Indeed, if a judge were to find a fact that increased the statutory maximum sentence, such a finding would violate the Sixth Amendment, even if the defendant ultimately received a sentence falling within the original sentencing range (*i.e.,* the range applicable without that aggravating fact). Cf. *Hobbs* v. *State*, 44 Tex. 353 (1875) (reversing conviction where the defendant was indicted for a crime punishable by 2 to 5 years and sentenced to 3 years because the trial court improperly instructed the jury to sentence the defendant between 2 to 10 years if it found a particular aggravating fact); *State* v. *Callahan*, 109 La. 946, 33 So. 931 (1903) (finding *ex post facto* violation where a newly enacted law increased the range of punishment, even though defendant was sentenced within the range established by the prior law).[4]

—————

Amendment violation. *Ibid.*

   [4]Many criminal statutes allow for this possibility. For example, an

The essential point is that the aggravating fact produced a higher range, which, in turn, conclusively indicates that the fact is an element of a distinct and aggravated crime. It must, therefore, be submitted to the jury and found beyond a reasonable doubt.

Because there is no basis in principle or logic to distinguish facts that raise the maximum from those that increase the minimum, *Harris* was inconsistent with *Apprendi.* It is, accordingly, overruled.[5]

## C

In holding that facts that increase mandatory minimum sentences must be submitted to the jury, we take care to note what our holding does not entail. Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment. See, *e.g., Dillon* v. *United States*, 560 U. S. ___, ___ (2010) (slip op., at 11) ("[W]ithin established limits[,] . . . the exercise of [sentencing] discretion does not contravene the Sixth

––––––––––

Illinois law provides for a sentence of 2 to 10 years' imprisonment for intimidation, Ill. Comp. Stat., ch. 720, §5/12–6(b) (West 2010), and 3 to 14 years for aggravated intimidation, §5/12–6.2(b). The elements of aggravated intimidation include all the elements of intimidation plus one enumerated aggravating fact. Under this statute, if a jury found each element of intimidation, but the judge purported to find a fact that elevated the offense to aggravated intimidation, the Sixth Amendment would most certainly be violated, even if the defendant received a sentence that fell within both ranges. See also La. Rev. Stat. Ann. §§14:51, 14:52 (West 2007) (sentencing range for simple arson is 2 to 15 years; sentencing range for aggravated arson is 6 to 20 years); Mont. Code Ann. §§45–5–302(2), 5–303(2) (2011) (sentencing range for kidnapping is 2 to 10 years, but 2 to life for aggravated kidnapping).

[5] The force of *stare decisis* is at its nadir in cases concerning procedural rules that implicate fundamental constitutional protections. Because *Harris* is irreconcilable with the reasoning of *Apprendi* and the original meaning of the Sixth Amendment, we follow the latter.

Amendment even if it is informed by judge-found facts" (emphasis deleted and internal quotation marks omitted)); *Apprendi*, 530 U. S., at 481 ("[N]othing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute").[6] This position has firm historical roots as well. As Bishop explained:

> "[W]ithin the limits of any discretion as to the punishment which the law may have allowed, the judge, when he pronounces sentence, may suffer his discretion to be influenced by matter shown in aggravation or mitigation, not covered by the allegations of the indictment." Bishop §85, at 54.

"[E]stablishing what punishment is available by law and setting a specific punishment within the bounds that the law has prescribed are two different things." *Apprendi, supra*, at 519 (THOMAS, J., concurring). Our decision today is wholly consistent with the broad discretion of judges to select a sentence within the range authorized by law.

## IV

Here, the sentencing range supported by the jury's verdict was five years' imprisonment to life. The District

---

[6] See also *United States* v. *Tucker*, 404 U. S. 443, 446 (1972) (judges may exercise sentencing discretion through "an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come"); *Williams* v. *New York*, 337 U. S. 241, 246 (1949) ("[B]oth before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law").

Court imposed the 7-year mandatory minimum sentence based on its finding by a preponderance of evidence that the firearm was "brandished." Because the finding of brandishing increased the penalty to which the defendant was subjected, it was an element, which had to be found by the jury beyond a reasonable doubt. The judge, rather than the jury, found brandishing, thus violating petitioner's Sixth Amendment rights.

Accordingly, we vacate the Fourth Circuit's judgment with respect to Alleyne's sentence on the §924(c)(1)(A) conviction and remand the case for resentencing consistent with the jury's verdict.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–9335

_____

## ALLEN RYAN ALLEYNE, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 17, 2013]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG and JUSTICE KAGAN join, concurring.

I join the opinion of the Court, which persuasively explains why *Harris* v. *United States*, 536 U. S. 545 (2002), and *McMillan* v. *Pennsylvania*, 477 U. S. 79 (1986), were wrongly decided. Under the reasoning of our decision in *Apprendi* v. *New Jersey*, 530 U. S. 466 (2000), and the original meaning of the Sixth Amendment, facts that increase the statutory minimum sentence (no less than facts that increase the statutory maximum sentence) are elements of the offense that must be found by a jury and proved beyond a reasonable doubt. *Ante,* at 1.

Of course, under our doctrine of *stare decisis*, establishing that a decision was wrong does not, without more, justify overruling it. While *stare decisis* is not an "inexorable command," *Hohn* v. *United States*, 524 U. S. 236, 251 (1998) (internal quotation marks omitted), it is "a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon 'an arbitrary discretion,'" *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172 (1989) (quoting The Federalist, No. 78, p. 490 (H. Lodge ed. 1888) (A. Hamilton)). We generally adhere to our prior decisions, even if we question their soundness, because doing so "promotes

the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991). To protect these important values, we require a ""special justification""" when departing from precedent. *Dickerson* v. *United States*, 530 U. S. 428, 443 (2000).

A special justification is present here. As an initial matter, when procedural rules are at issue that do not govern primary conduct and do not implicate the reliance interests of private parties, the force of *stare decisis* is reduced. See *United States* v. *Gaudin*, 515 U. S. 506, 521 (1995); *Payne*, 501 U. S., at 828. And any reliance interest that the Federal Government and state governments might have is particularly minimal here because prosecutors are perfectly able to "charge facts upon which a mandatory minimum sentence is based in the indictment and prove them to a jury." *Harris*, 536 U. S., at 581 (THOMAS, J., dissenting). Indeed, even with *Harris* in place, prosecutors already sometimes charge such facts and seek to prove them to a jury. See Brief for National Association of Criminal Defense Lawyers et al. as *Amici Curiae* 26. That is precisely what happened here, where the verdict form allowed the jury to find whether petitioner had brandished a firearm yet the jury declined to make such a finding. *Ante,* at 2.

In this context, *stare decisis* does not compel adherence to a decision whose "underpinnings" have been "eroded" by subsequent developments of constitutional law. *Gaudin*, 515 U. S., at 521. In rejecting a constitutional challenge to a state statute that increased a defendant's minimum sentence based on judicial factfinding, *McMillan* relied on a distinction between "elements" and "sentencing factors." 477 U. S., at 86. That distinction was undermined by *Apprendi*, where we held that a legislature may not "remove from the jury the assessment of facts that increase

the prescribed range of penalties to which a criminal defendant is exposed." 530 U. S., at 490 (internal quotation marks omitted).

In *Harris*, we squarely confronted the question whether "*McMillan* stands after *Apprendi*." 536 U. S., at 550. Five Members of the Court recognized that the cases were in fact incompatible. See *id.*, at 569 (BREYER, J., concurring in part and concurring in judgment); *id.,* at 572, 583 (THOMAS, J., dissenting) ("[O]nly a minority of the Court embrac[es] the distinction between *McMillan* and *Apprendi* that forms the basis of today's holding"). In the controlling opinion, JUSTICE BREYER nevertheless declined to apply *Apprendi* to mandatory minimums because, though he found no way to distinguish sentencing floors from sentencing ceilings, he could not "yet accept" *Apprendi* itself. 536 U. S., at 569; see also *post,* at 1 (BREYER, J., concurring in part and concurring in judgment).

We have said that a decision may be "of questionable precedential value" when "a majority of the Court expressly disagreed with the rationale of [a] plurality." *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 66 (1996). And *Harris* has stood on especially weak ground because its vitality depended upon the possibility that the Court might retreat from *Apprendi*. See *Harris*, 536 U. S., at 569–570 (opinion of BREYER, J.). That has not happened. Instead, while individual Members of this Court have continued to question *Apprendi*, see *post,* at 1–2 (opinion of BREYER, J.); *post,* at 1–2 (ALITO, J., dissenting), its rule has become even more firmly rooted in the Court's Sixth Amendment jurisprudence in the decade since *Harris*. We have applied *Apprendi* to strike down mandatory sentencing systems at the state and federal levels. See *Cunningham* v. *California*, 549 U. S. 270 (2007)*; United States* v. *Booker*, 543 U. S. 220 (2005); *Blakely* v. *Washington*, 542 U. S. 296 (2004). And just last Term, we recognized that *Apprendi*'s reasoning extends to criminal fines. See

*Southern Union Co.* v. *United States*, 567 U. S. ___ (2012).

As a result of these decisions, *Harris* has become even more of an outlier. For that reason, I agree that it is appropriate for the Court to "overrule *Harris* and to apply *Apprendi*'s basic jury-determination rule to mandatory minimum sentences" in order to "erase th[is] anomaly" in our case law. *Post*, at 2–3 (opinion of BREYER, J.). I do not suggest that every single factor that supports the overruling of precedent is present here. *Post,* at 3, n. * (ALITO, J., dissenting). But particularly in a case where the reliance interests are so minimal, and the reliance interests of private parties are nonexistent, *stare decisis* cannot excuse a refusal to bring "coherence and consistency," *Patterson*, 491 U. S., at 174, to our Sixth Amendment law.

If any doubt remained, our decision in *Ring* v. *Arizona*, 536 U. S. 584 (2002), should remove it. *Ring* considered an *Apprendi* challenge to Arizona's capital sentencing system. There, as here, the government urged us to adhere to a pre-*Apprendi* decision upholding that scheme. See *Walton* v. *Arizona*, 497 U. S. 639 (1990). And there, as here, we resisted that plea. *Ring*, 536 U. S., at 609. This case differs in only one respect: Our post-*Apprendi* consideration of the issue in *Harris*. But for the reasons given, *Harris* in no way strengthens the force of *stare decisis* in this case. With *Apprendi* now firmly rooted in our jurisprudence, the Court simply gives effect to what five Members of the Court recognized in *Harris*: "[*McMillan*] and *Apprendi* are irreconcilable; our Sixth Amendment jurisprudence cannot be home to both." 536 U. S., at 609.

JUSTICE ALITO is therefore mistaken when he suggests that the Court overrules *Harris* because "there are currently five Justices willing to vote to" do so. *Post,* at 3, n. *. No doubt, it would be illegitimate to overrule a precedent simply because the Court's current membership disagrees with it. But that is not a plausible account of the decision today. The Court overrules *McMillan* and

*Harris* because the reasoning of those decisions has been thoroughly undermined by intervening decisions and because no significant reliance interests are at stake that might justify adhering to their result. Likewise, JUSTICE ALITO exaggerates when he suggests that this case creates an important "precedent about precedent." *Post*, at 2. Rarely will a claim for *stare decisis* be as weak as it is here, where a constitutional rule of criminal procedure is at issue that a majority of the Court has previously recognized is incompatible with our broader jurisprudence. And finally, JUSTICE ALITO's contention that *Apprendi* and *Harris* stand on equal footing for *stare decisis* purposes, *post,* at 1–2, 3–4, n. *, is simply inconsistent with our last decade of Sixth Amendment jurisprudence.

　Because I believe that the Court's decision to apply *Apprendi* to mandatory minimums is consistent with *stare decisis* principles, I join the opinion of the Court.

# SUPREME COURT OF THE UNITED STATES

No. 11–9335

ALLEN RYAN ALLEYNE, PETITIONER *v.*
UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 17, 2013]

JUSTICE BREYER, concurring in part and concurring in the judgment.

Eleven years ago, in *Harris* v. *United States*, 536 U. S. 545 (2002), I wrote that "I cannot easily distinguish *Apprendi* v. *New Jersey*, 530 U. S. 466 (2000), from this case in terms of logic." *Id.*, at 569 (opinion concurring in part and concurring in judgment). I nonetheless accepted *Harris*' holding because I could "[n]ot yet accept [*Apprendi*'s] rule." 536 U. S., at 569. I continue to disagree with *Apprendi*. See 536 U. S., at 569–570; *United States* v. *Booker*, 543 U. S. 220, 326 (2005) (opinion dissenting in part); *Blakely* v. *Washington*, 542 U. S. 296, 328 (2004) (dissenting opinion); *Apprendi*, *supra*, at 555 (same). But *Apprendi* has now defined the relevant legal regime for an additional decade. And, in my view, the law should no longer tolerate the anomaly that the *Apprendi/Harris* distinction creates.

The Court's basic error in *Apprendi*, I believe, was its failure to recognize the law's traditional distinction between elements of a crime (facts constituting the crime, typically for the jury to determine) and sentencing facts (facts affecting the sentence, often concerning, *e.g.,* the manner in which the offender committed the crime, and typically for the judge to determine). The early historical references that this Court's opinions have set forth in

favor of *Apprendi* refer to *offense elements,* not to *sentencing facts.* Thus, when Justice Story wrote that the Sixth Amendment's guarantee of trial by jury offered "'securit[y] against the prejudices of judges,'" *post,* at 4 (ROBERTS, C. J., dissenting) (quoting Commentaries on the Constitution of the United States §924, p. 657 (Abr. 1833)), he was likely referring to elements of a crime; and the best answer to JUSTICE SCALIA's implicit question in *Apprendi*—what, exactly, does the "right to trial by jury" guarantee?—is that it guarantees a jury's determination of facts that constitute the elements of a crime. 530 U. S., at 498–499 (concurring opinion).

Although I have set forth these minority views before, see *Booker*, *supra,* at 326 (opinion dissenting in part); *Blakely*, *supra,* at 328 (dissenting opinion); *Apprendi*, *supra,* at 555 (same), I repeat this point now to make clear why I cannot accept the dissent's characterization of the Sixth Amendment as simply seeking to prevent "judicial overreaching" when sentencing facts are at issue, *post,* at 4. At the very least, the Amendment seeks to protect defendants against "the wishes and opinions of the government" as well. *Ibid.* (quoting Story, *supra*, §924, at 657). And, that being so, it seems to me highly anomalous to read *Apprendi* as insisting that juries find sentencing facts that *permit* a judge to impose a higher sentence while not insisting that juries find sentencing facts that *require* a judge to impose a higher sentence. See *Harris*, *supra*, at 569–570 (opinion of BREYER, J.).

To overrule *Harris* and to apply *Apprendi*'s basic jury-determination rule to mandatory minimum sentences would erase that anomaly. Where a *maximum* sentence is at issue, *Apprendi* means that a judge who *wishes* to impose a higher sentence cannot do so unless a jury finds the requisite statutory factual predicate. Where a *mandatory minimum* sentence is at issue, application of *Apprendi*

would mean that the government cannot force a judge who *does not wish* to impose a higher sentence to do so unless a jury finds the requisite statutory factual predicate. In both instances the matter concerns higher sentences; in both instances factfinding must trigger the increase; in both instances jury-based factfinding would act as a check: in the first instance, against a sentencing judge wrongly imposing the higher sentence that the judge believes is appropriate, and in the second instance, against a sentencing judge wrongly being required to impose the higher sentence that the judge believes is inappropriate.

While *Harris* has been the law for 11 years, *Apprendi* has been the law for even longer; and I think the time has come to end this anomaly in *Apprendi*'s application. Consequently, I vote to overrule *Harris*. I join Parts I, III–B, III–C, and IV of the Court's opinion and concur in its judgment.

# SUPREME COURT OF THE UNITED STATES

————

No. 11–9335

————

## ALLEN RYAN ALLEYNE, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 17, 2013]

CHIEF JUSTICE ROBERTS, with whom JUSTICE SCALIA and JUSTICE KENNEDY join, dissenting.

Suppose a jury convicts a defendant of a crime carrying a sentence of five to ten years. And suppose the judge says he would sentence the defendant to five years, but because he finds that the defendant used a gun during the crime, he is going to add two years and sentence him to seven. No one thinks that this violates the defendant's right to a jury trial in any way.

Now suppose the legislature says that two years should be added to the five year minimum, if the judge finds that the defendant used a gun during the crime. Such a provision affects the role of the judge—limiting his discretion—but has no effect on the role of the jury. And because it does not affect the jury's role, it does not violate the jury trial guarantee of the Sixth Amendment.

The Framers envisioned the Sixth Amendment as a protection for defendants from the power of the Government. The Court transforms it into a protection for judges from the power of the legislature. For that reason, I respectfully dissent.

## I

In a steady stream of cases decided over the last 15 years, this Court has sought to identify the historical

understanding of the Sixth Amendment jury trial right and determine how that understanding applies to modern sentencing practice. Our key sources in this task have been 19th-century treatises and common law cases identifying which facts qualified as "elements" of a crime, and therefore had to be alleged in the indictment and proved to a jury beyond a reasonable doubt. See, *e.g., Apprendi* v. *New Jersey*, 530 U. S. 466, 476–483, 489–490, n. 15 (2000) (collecting sources); *id.,* at 501–518 (THOMAS, J., concurring) (same). With remarkable uniformity, those authorities provided that an element was "whatever is in law essential to the punishment sought to be inflicted." 1 J. Bishop, Criminal Procedure 50 (2d ed. 1872); see also *Apprendi, supra*, at 489, n. 15 ("'[T]he indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted'" (quoting *United States* v. *Reese*, 92 U. S. 214, 232 (1876) (Clifford, J., dissenting))); 1 Bishop, *supra,* §87, at 55 (an indictment must include "any particular fact which the law makes essential to the punishment").

Judging that this common law rule best reflects what the Framers understood the Sixth Amendment jury right to protect, we have struck down sentencing schemes that were inconsistent with the rule. In *Apprendi*, for example, the defendant pleaded guilty to a crime that carried a maximum sentence of ten years. After his plea, however, the trial judge determined that the defendant had committed the crime with a biased purpose. Under a New Jersey law, that finding allowed the judge to impose up to ten additional years in prison. Exercising that authority, the judge sentenced the defendant to 12 years. 530 U. S., at 469–471.

Because the sentence was two years longer than would have been possible without the finding of bias, that finding was "essential to the punishment" imposed. 1 Bishop, *supra,* at 50; see *Apprendi*, 530 U. S., at 491–492. Thus,

in line with the common law rule, we held the New Jersey procedure unconstitutional. *Id.,* at 497.

Subsequent cases have worked out how this principle applies in other contexts, such as capital sentencing regimes, state and federal sentencing guidelines, or criminal fines. See *Ring* v. *Arizona*, 536 U. S. 584 (2002); *Blakely* v. *Washington*, 542 U. S. 296 (2004); *United States* v. *Booker*, 543 U. S. 220 (2005); *Southern Union Co.* v. *United States*, 567 U. S. \_\_\_ (2012). Through all of them, we have adhered to the rule, rooted in the common law understanding described above, that we laid down in *Apprendi*: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U. S., at 490; see *Blakely*, *supra*, at 301 (quoting above statement); *Booker*, *supra*, at 231 (same); *Southern Union Co.*, *supra,* at \_\_\_ (slip op., at 3) (same); see also *Ring, supra,* at 588–589 (Sixth Amendment "does not permit a defendant to be 'expose[d] . . . to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone'" (quoting *Apprendi, supra,* at 483; alterations in original).

We have embraced this 19th-century common law rule based not only on a judgment that it reflects the understanding in place when the Sixth Amendment was ratified, but also on the "need to give intelligible content to the right of jury trial." *Blakely*, *supra,* at 305. As JUSTICE SCALIA wrote in *Apprendi*, it is unclear "what the right to trial by jury *does* guarantee if . . . it does not guarantee . . . the right to have a jury determine those facts that determine the maximum sentence the law allows." 530 U. S., at 498–499 (concurring opinion).

After all, if a judge's factfinding could authorize a sentence beyond that allowed by the jury's verdict alone, the jury trial would be "a mere preliminary to a judicial inqui-

sition into the facts of the crime the State *actually* seeks to punish." *Blakely*, *supra,* at 306–307. The Framers clearly envisioned a more robust role for the jury. They appreciated the danger inherent in allowing "justices . . . named by the crown" to "imprison, dispatch, or exile any man that was obnoxious to the government, by an instant declaration, that such is their will and pleasure." 4 W. Blackstone, Commentaries on the Laws of England 343 (1769). To guard against this "violence and partiality of judges appointed by the crown," the common law "wisely placed th[e] strong . . . barrier, of . . . trial by jury, between the liberties of the people, and the prerogative of the crown." *Ibid.* The Sixth Amendment therefore provided for trial by jury as a "double security, against the prejudices of judges, who may partake of the wishes and opinions of the government, and against the passions of the multitude, who may demand their victim with a clamorous precipitancy." J. Story, Commentaries on the Constitution of the United States §924, p. 657 (Abr. 1833); see also The Federalist No. 83, p. 499 (C. Rossiter ed. 1961) (A. Hamilton) (discussing criminal jury trial as a protection against "judicial despotism"). Our holdings that a judge may not sentence a defendant to more than the jury has authorized properly preserve the jury right as a guard against judicial overreaching.

## II

There is no such risk of judicial overreaching here. Under 18 U. S. C. §924(c)(1)(A)(i), the jury's verdict fully authorized the judge to impose a sentence of anywhere from five years to life in prison. No additional finding of fact was "essential" to any punishment within the range. After rendering the verdict, the jury's role was completed, it was discharged, and the judge began the process of determining where within that range to set Alleyne's sentence.

Everyone agrees that in making that determination, the judge was free to consider any relevant facts about the offense and offender, including facts not found by the jury beyond a reasonable doubt.

> "[B]oth before and since the American colonies became a nation, courts . . . practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law." *Williams* v. *New York*, 337 U. S. 241, 246 (1949).

As *Apprendi* itself recognized, "nothing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment within the range prescribed by statute." 530 U. S., at 481 (emphasis deleted); see also *Dillon* v. *United States*, 560 U. S. \_\_, \_\_ (2010) (slip op., at 11). And the majority does not dispute the point. *Ante*, at 15 ("Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury."). Thus, under the majority's rule, in the absence of a statutory mandatory minimum, there would have been no constitutional problem had the judge, exercising the discretion given him by the jury's verdict, decided that seven years in prison was the appropriate penalty for the crime *because of* his finding that the firearm had been brandished during the offense.

In my view, that is enough to resolve this case. The jury's verdict authorized the judge to impose the precise sentence he imposed for the precise factual reason he imposed it. As we have recognized twice before, the Sixth Amendment demands nothing more. See *Harris* v. *United States*, 536 U. S. 545, 568–569 (2002); *McMillan* v. *Pennsylvania*, 477 U. S. 79, 93 (1986).

### III

This approach is entirely consistent with *Apprendi.* As I have explained, *Apprendi*'s constraint on the normal legislative control of criminal procedure draws its legitimacy from two primary principles: (1) common law understandings of the "elements" of a crime, and (2) the need to preserve the jury as a "strong barrier" between defendants and the State. Neither of those principles supports the rule the majority adopts today.

First, there is no body of historical evidence supporting today's new rule. The majority does not identify a single case holding that a fact affecting only the sentencing floor qualified as an element or had to be found by a jury, nor does it point to any treatise language to that effect. *Ante,* at 8–10. To be sure, the relatively recent vintage of mandatory minimum sentencing enhancements means that few, if any, 19th-century courts would have encountered such a fact pattern. So I do not mean to suggest that the absence of historical condemnation of the practice conclusively establishes its constitutionality today. But given that *Apprendi*'s rule rests heavily on affirmative historical evidence about the practices to which we have previously applied it, the lack of such evidence on statutory minimums is a good reason not to extend it here.

Nor does the majority's extension of *Apprendi* do anything to preserve the role of the jury as a safeguard between the defendant and the State. That is because even if a jury does not find that the firearm was brandished, a judge can do so and impose a harsher sentence because of his finding, so long as that sentence remains under the statutory maximum. The question here is about the power of judges, not juries. Under the rule in place until today, a legislature could tell judges that certain facts carried certain weight, and require the judge to devise a sentence based on that weight—so long as the sentence remained within the range authorized by the jury. Now, in the

name of the jury right that formed a barrier between the
defendant and the State, the majority has erected a bar-
rier between judges and legislatures, establishing that
discretionary sentencing is the domain of judges. Legisla-
tures must keep their respectful distance.

I find this new rule impossible to square with the histor-
ical understanding of the jury right as a defense *from*
judges, not a defense *of* judges. See *Apprendi*, *supra*, at
498 (SCALIA, J., concurring) ("Judges, it is sometimes
necessary to remind ourselves, are part of the State").
Just as the Sixth Amendment "limits judicial power only
to the extent that the claimed judicial power infringes on
the province of the jury," *Blakely*, 542 U. S*.,* at 308*,* so too
it limits *legislative* power only to the extent *that* power
infringes on the province of the jury. Because the claimed
infringement here is on the province of the judge, not the
jury, the jury right has no work to do.

IV

The majority offers several arguments to the contrary. I
do not find them persuasive.

First, the majority asserts that "because the legally
prescribed range *is* the penalty affixed to the crime, it
follows that a fact increasing either end of the range pro-
duces a new penalty and constitutes an ingredient of the
offense." *Ante*, at 11 (citation omitted). The syllogism
trips out of the gate, for its first premise—that the consti-
tutionally relevant "penalty" includes the bottom end of
the statutory range—simply assumes the answer to the
question presented. Neither of the historical sources to
which the majority points gives an answer: The Bishop
treatise speaks only to situations in which "a statute
prescribes a particular punishment," not a range of possi-
ble punishments. 1 Bishop, Criminal Procedure §598, at
360–361. The Wharton treatise is similarly unhelpful,
focusing on statutes that change the maximum or alter the

nature of the common law crime. See 1 F. Wharton, Criminal Law §371, p. 291 (rev. 7th ed. 1874). The sources provided in the *Apprendi* concurrence offer no support, for as already discussed, we lack historical evidence about the treatment of facts that altered *only* the floor of a sentencing range.

Second, the majority observes that "criminal statutes have long specified both the floor and ceiling of sentence ranges, which is evidence that both define the legally prescribed penalty." *Ante*, at 11. Again, though, this simply assumes the core premise: That the constitutionally relevant "penalty" involves both the statutory minimum and the maximum. Unless one accepts that premise on faith, the fact that statutes have long specified both floor and ceiling is evidence of nothing more than that statutes have long specified both the floor and the ceiling. Nor does it help to say that "the floor of a mandatory range is as relevant to wrongdoers as the ceiling." *Ante*, at 12. The meaning of the Sixth Amendment does not turn on what wrongdoers care about most.

More importantly, legal rules frequently focus on the maximum sentence while ignoring the minimum, even though both are "relevant" to punishment. Closest to this case, the question whether the jury right applies at all turns on whether the *maximum* sentence exceeds six months—not, say, whether the minimum punishment involves time in prison. *Blanton* v. *North Las Vegas*, 489 U. S. 538, 543 (1989); see also *Lewis* v. *United States*, 518 U. S. 322, 326 (1996) ("In evaluating the seriousness of the offense, we place primary emphasis on the maximum prison term authorized"). Likewise, the rights to vote and to bear arms are typically denied to felons—that is, those convicted of a crime with a maximum sentence of more than one year in prison. See *Richardson* v. *Ramirez*, 418 U. S. 24, 48 (1974); *District of Columbia* v. *Heller*, 554 U. S. 570, 626 (2008); Black's Law Dictionary 694 (9th ed.

2009). Examples of other distinctions turning only on maximum penalties abound, as in cases of recidivism enhancements that apply only to prior convictions with a maximum sentence of more than a specified number of years. See, *e.g.,* 18 U. S. C. §924(e)(2). That a minimum sentence is "relevant" to punishment, and that a statute defines it, does not mean it must be treated the same as the maximum sentence the law allows.

Third, the majority offers that "it is impossible to dispute that facts increasing the legally prescribed floor *aggravate* the punishment." *Ante,* at 12. This argument proves too much, for it would apply with equal force to any fact which leads the judge, in the exercise of his own discretion, to choose a penalty higher than he otherwise would have chosen. The majority nowhere explains what it is about the jury right that bars a determination by Congress that brandishing (or any other fact) makes an offense worth two extra years, but not an identical determination by a judge. Simply calling one "aggravation" and the other "discretion" does not do the trick.

Fourth, the majority argues that "[i]t is no answer to say that the defendant could have received the same sentence with or without" a particular factual finding, pointing out "that a defendant could not be convicted and sentenced for assault, if the jury only finds the facts for larceny, even if the punishments prescribed for each crime are identical." *Ante*, at 14. In that hypothetical case, the legislature has chosen to define two crimes with two different sets of elements. Courts must, of course, respect that legislative judgment. But that tells us nothing about when courts can override the legislature's decision *not* to create separate crimes, and instead to treat a particular fact as a trigger for a minimum sentence within the already-authorized range.

\*      \*      \*

I will not quibble with the majority's application of our *stare decisis* precedents.  But because I believe the majority's new rule—safeguarding the power of judges, not juries—finds no support in the history or purpose of the Sixth Amendment, I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–9335

_____

## ALLEN RYAN ALLEYNE, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 17, 2013]

JUSTICE ALITO, dissenting.

The Court overrules a well-entrenched precedent with barely a mention of *stare decisis*. See *ante*, at 16, n. 6. *Stare decisis* is, of course, not an "inexorable command" in the field of constitutional law. *Payne* v. *Tennessee*, 501 U. S. 808, 828 (1991). Nevertheless, the Court ought to be consistent in its willingness to reconsider precedent. If *Harris* v. *United States*, 536 U. S. 545 (2002), and *McMillan* v. *Pennsylvania*, 477 U. S. 79 (1986), can be cast aside simply because a majority of this Court now disagrees with them, that same approach may properly be followed in future cases. See *Arizona* v. *Gant*, 556 U. S. 332, 358–364 (2009) (ALITO, J., dissenting).

If the Court is of a mind to reconsider existing precedent, a prime candidate should be *Apprendi* v. *New Jersey*, 530 U. S. 466 (2000). Although *Apprendi* purported to rely on the original understanding of the jury trial right, there are strong reasons to question the Court's analysis on that point. See, *e.g.*, Bibas, Judicial Fact-Finding and Sentence Enhancements in a World of Guilty Pleas, 110 Yale L. J. 1097, 1123–1132 (2001) (critiquing the historical evidence relied upon by the *Apprendi* majority and concurrence, and concluding (1) that the "broad judicial discretion" characteristic of eighteenth-century common-law misdemeanor sentencing "undercuts the suggestion that sen-

tencing was the sacred province of juries alone," (2) that even the "nineteenth-century tradition was not uniform, suggesting that the common law had no fixed rule on the subject," and (3) that "no eighteenth-century evidence link[ed] this [nineteenth-century] tradition back to the time of the Founding"); Little & Chen, The Lost History of *Apprendi* and the *Blakely* Petition for Rehearing, 17 Fed. Sentencing Rep. 69, 69–74 (2004) ("*Blakely* and *Apprendi* were undoubtedly founded on an erroneous historical understanding of the Framers' views in 1790 when they wrote the 6th Amendment's jury-trial guarantee. The fact that the Framers themselves wrote over a dozen indeterminate sentencing ranges in the first federal crime bill (*see* 1 Stat. 112–118 . . .), has simply been overlooked by the Court"); Mitchell, *Apprendi*'s Domain, 2006 Sup. Ct. Rev. 297, 298–299 (2006) (arguing, in the context of defending a broader conception of the jury right, that "*Apprendi*'s historical claim that sentencing enhancements were treated as 'elements' of offenses whenever they increased a defendant's maximum punishment is demonstrably mistaken" and that "the platitudes from Joel Prentiss Bishop's nineteenth-century treatises, which the pro-*Apprendi* Justices repeatedly invoke to support this assertion [that sentencing enhancements that increased a maximum punishment were treated as elements of the offense], are patently false and did not accurately describe the law in actual court decisions of that era" (footnotes omitted)).

The Court's decision creates a precedent about precedent that may have greater precedential effect than the dubious decisions on which it relies.*

————————

* Speaking for herself, JUSTICE GINSBURG, and JUSTICE KAGAN—but not for the Court—JUSTICE SOTOMAYOR argues that *Harris'* *stare decisis* value is undermined by the subsequent reasoning of the Court's *Apprendi* line of cases and by the fact that no one rationale in *Harris* commanded five votes. I disagree.

In my view, *Harris'* force is not vitiated by the Court's *Apprendi* line

————

of cases, for two reasons. First, that line of cases is predicated on a purported Sixth Amendment requirement that juries find facts that increase maximum penalties, not mandatory minimums. Accordingly, as THE CHIEF JUSTICE's dissent persuasively explains, *ante*, at 1–7, *Apprendi* and its progeny have no impact on the distinct question resolved by *Harris*, which does not bear on the jury right. Second, the *Apprendi* line is now too intellectually incoherent to undermine any "contrary" precedents. If the rationale of *Apprendi*—which, as broadly construed by the Court in this case, is that "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt," *ante*, at 1—were taken seriously, discretionary sentencing, as prescribed by 18 U. S. C. §3553(a), should also be held to violate the Sixth Amendment. But a majority of the Court has not been willing to go where its reasoning leads.

Nor can it be correct to say that "*Harris* in no way strengthens the force of *stare decisis* in this case" because a "'majority of the Court expressly disagreed with the rationale of [a] plurality.'" *Ante*, at 3–4 (SOTOMAYOR, J., concurring) (quoting *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 66 (1996)). Decisions in which no one rationale commands a majority of the Court—including prominent decisions based on the views of a single Justice—are often thought to have precedential effect. See, *e.g.*, *United States* v. *Booker*, 543 U. S. 220 (2005); *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 269–272 (1978) (opinion of Powell, J.). And, of course, if *Harris* is not entitled to *stare decisis* weight, then neither is the Court's opinion in this case. After all, only four Members of the Court think that the Court's holding is the correct reading of the Constitution. See *ante*, at 1–3 (BREYER, J., concurring in part and concurring in judgment).

As she concedes, *ante,* at 4, JUSTICE SOTOMAYOR's concurrence is necessarily selective in its discussion of the factors that the Court has previously found to be relevant to the application of *stare decisis*. For example, she does not argue—presumably because there is no good argument to be made—that *Harris* and *McMillan* v. *Pennsylvania*, 477 U. S. 79 (1986) (which provide the framework under which criminal prosecutions have been carried out for at least the past 27 years) have proved "'unworkable.'" *Vieth* v. *Jubelirer*, 541 U. S. 267, 306 (2004) (plurality opinion) (quoting *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991)). Nor does she contend that "circumstances" outside the Court "have changed so radically as to undermine [*Harris*'] critical factual assumptions." *Randall* v. *Sorrell*, 548 U. S. 230, 244 (2006) (plurality opinion). Indeed, no party or *amicus* has cited any such circumstances.

In short, other than the fact that there are currently five Justices

_____

willing to vote to overrule *Harris*, and not five Justices willing to overrule *Apprendi*, there is no compelling reason why the Court overrules the former rather than the latter. If the opportunity arises in the future to overrule *Apprendi* or the present case—both of which presumably involve "procedural rules . . . that do not govern primary conduct and do not implicate the reliance interests of private parties," *ante,* at 2 (SOTOMAYOR, J., concurring)—the precedent the Court sets today will be relevant to the issue of *stare decisis.*